J-S06020-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALFRED KEITH STEELE | : | |
| | : | |
| Appellant | : | No. 754 WDA 2024 |

Appeal from the Judgment of Sentence Entered February 12, 2024
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-CR-0002000-2022

BEFORE:  PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY LANE, J.:                    **FILED: May 9, 2025**

Alfred Keith Steele ("Steele") appeals from the judgment of sentence imposed following his jury conviction of first-degree murder.[1]  We affirm.

On May 14, 2022, Steele shot his wife, Kelly Steele (the "Victim"), in the back of the head while the couple were in a storage facility in Lower Burrell, Westmoreland County.  The Victim died from the gunshot wound. Approximately one hour later, Steele went to a Pennsylvania State Police barracks and confessed to shooting the Victim, but he claimed it was accidental.

The Commonwealth charged Steele with first-degree and third-degree murder.  Steele's jury trial commenced on Monday, November 13, 2023.  On the evening of November 15, 2023, following the third day of trial,

_____

[1] 18 Pa.C.S.A. § 2502(a).

Westmoreland County Assistant District Attorney ("ADA") James Lazar, Esquire ("Attorney Lazar"), who had no role in the Steele trial, informed the trial court that Juror 14 had sent him a text message.

The following morning, the trial court summoned both parties' counsel and Attorney Lazar into chambers and disclosed the unsolicited communication from Juror 14, one of two alternate jurors.[2] Attorney Lazar testified that his children are "great friends" with Juror 14's children and he received the text message from Juror 14 the prior evening. N.T., 11/16/23, at 541. Juror 14's message stated:

> I'm not saying anything specific about the case, . . . so you can read this. Just a general complaint about your stupid DA . . .
>
> It's getting to a point where all jurors are complaining. He put the other alternate to sleep twice yesterday, three jurors to sleep this morning. Took 45 and 48 minutes only to establish the witnesses are experts prior to even questioning them about the case just today. I didn't time it yesterday, but it was just as bad.
>
> The judge must have said something at lunch because he did slightly speed up. However, did get called out twice to basically get to the point. The secretary and witnesses are trying to professionally explain they're repeating themselves. Their facial expressions speak volumes.
>
> So please, please, please tell him to just . . . get to the point.

---

[2] The trial court conducted this questioning in chambers, with counsel present (though not Steele), as well as the court reporter. The jurors and Attorney Lazar were put under oath, and the discussion was transcribed.

*Id*. at 541-42.  Attorney Lazar stated he did not respond to Juror 14 and instead sent a message to Juror 14's husband indicating he could not communicate with her.  *See id*. at 542-43.

The trial court then examined Juror 14 individually in chambers, followed by the other jurors.  The court summarized the testimony of the jurors as follows:

> . . . Juror 14 admitted that she sent [Attorney] Lazar the message because other jurors were "making remarks of falling asleep and just getting to the point of things."  [N.T., 11/16/23, at] at 545.  She stated, "[I]t was all just like, like I said, just how much longer till we figure out somebody's a professional.  Nothing specifically at all.  Just we would joke about somebody falling asleep because a couple people did fall asleep and snoring and things."  [*Id*.] at 546.  When asked for specifics, she claimed that Juror 13[, the other alternate juror,] fell asleep, but otherwise, she did not see anyone else sleeping.  [*See id*.] at 546-48.  Juror 14 did not remember which other jurors were complaining or specifically what they said.  [*See id*.] at 545-48. **Th[e trial c]ourt dismissed [Juror 14]** and brought each of the remaining jurors into chambers individually to ensure they could remain fair and impartial for the remainder of the trial.  [*See id*.] at 549-50.
>
> The [c]ourt questioned Juror 1 first.  [*See id*.] at 550. During questioning, she disclosed that earlier that morning, [the other alternate juror,] Juror 13, "trying to be funny," made a comment that, "in the event that his opinion matters, he would find the defendant guilty."  [*Id*.] at 552.  Juror 1 explained that "[e]verybody just said, shhh, stop, we're not supposed to say anything.  I think he was trying to . . . break the ice, because it was quiet."  [*Id*.]
>
> Following the disclosure, the [c]ourt questioned each juror regarding both issues: any comments among the jurors regarding the length of testimony and the comment made by Juror 13.  [*See id*.] at 550-[]99.  The attorneys for both parties were also given the opportunity to question each juror.  [*See id*.]
>
> Regarding any complaints or comments among the jurors regarding the length of testimony, each juror admitted that there

- 3 -

was complaining amongst the jurors about the length of the testimony presented by the Commonwealth. [*See id*.] at 551, 556, 560, 564, 567, 575, 579, 583, 585, 588, 591, 595. Some jurors testified that it seemed to be lasting longer than anticipated, despite that it was only Thursday morning and the [c]ourt told them on Monday that the trial may last up to five days, through Friday. [*See id*.] at 566-67. Several jurors explained that the complaints centered around the length of time the Commonwealth spent qualifying expert witnesses. [*See id*.] at 551, 579, 583. However, when the [c]ourt questioned each of the jurors as to whether these complaints impacted their ability to follow the [c]ourt's instructions, each juror confirmed that they could. [*See id*.] at 553, 580, 584. Juror 5 stated, "[N]o one's going to jeopardize a man's life over, you know, being in a hurry to get out of there. I think that would be a terrible thing to any human being." [*Id*.] at 569. Additionally, Juror 11 stated, "I understand the weight of what's involved here. This is a life, and we have to be doing our duty." [*Id*.] at 592. . . .

Regarding the comment from Juror 13 about [Steele's] guilt, seven of the twelve principal jurors testified that they did not hear the comment. [*See id*.] at 563, 567, 583-87, 590-91, 594-95. . . . Some jurors who did hear the comment believed it was intended as a joke. [*See id*.] at 552, 578. Juror 7 testified that she responded by telling Juror 13 that they were not supposed to talk about that, which was corroborated by Jurors 1 and 6. [*See id*.] at 552, 571, 578-79. Juror 2 testified that there was no further comment other than ignoring it, and Juror 3 stated that there was some chuckling, followed by silence. [*See id*.] at 555, 558. Juror 6 testified to having heard the comment from Juror 13 and stated[,] "I think that he didn't really say what he would have voted, because I think we all know without talking about it what we're down to decision-wise." [*Id*.] at 570. Juror 6 testified that, based on [Steele's] admission, jurors seemed to be "on the same page["] and that they "heard the same thing." [*Id*.] at 572-73. When questioned further, she stated that they all heard [Steele's] recorded confession [to the Pennsylvania State Police. *See id*.] at 576. Juror 6 clarified that she had already made up her mind that [Steele] was guilty of the killing because [he] admitted to it, but she understood that there was something left to decide. [*See id*.] at 572. She explained that jurors had not discussed it, and she understood that there was still a decision to be made. [*See id*.] at 572-76. Juror 6 also said that she did not have any fixed

opinion on the outcome of the case, nor did she believe that any other jurors had already made up their minds. [*See id*.] at 574.

* * * *

. . . Juror 13 . . . admitted that he told other jurors that he believed [Steele] was guilty, and he initially indicated that others responded that they felt the same way. [*See id*.] at 598. When the [c]ourt inquired further as to the responses of the other jurors, Juror 13 could not recall who verbally agreed with him. [*See id*.] at 599. Then, he stated that no one verbally agreed with him, only nodded heads. [*See id*.] . . . **The [c]ourt ultimately dismissed Juror 13**. [*See id*.] at 599.

Trial Court Opinion, 6/12/24, at 3-6 (emphases added).

Then, after the examination of the jurors, defense counsel made the mistrial motion in open court, outside the presence of the jury. The trial court denied the motion. The court concluded that Juror 14's text message to Attorney Lazar did not involve the substance of the case and therefore did not prejudice Steele. **See** N.T., 11/16/23, at 605. The court found the remaining jurors' statements that they would follow the court's instructions and not rush to judgment to be "genuine and credible." **See id**.

The trial court also found Juror 13's statement that "he would find the defendant guilty" "more concerning," but not grounds for mistrial. **See id**. at 552, 605-07. The court determined that the jurors who said they did not hear the comment were "telling . . . the truth." **See id**. at 606. The court observed that the remaining jurors each stated that: Juror 13's comment did not impact their individual opinions of the case; they had not made up their minds about the case and would keep an open mind; and they would be able to follow the

court's instructions. *See id*. at 606-07. The court found this testimony to be "honest" and "credible." *See id*.

Following the denial of mistrial on the morning of November 16, 2023, the Commonwealth presented its final witness and rested. Steele then testified in his own defense. Upon agreement of the parties, the trial court instructed the jury as to first-degree and third-degree murder and voluntary and involuntary manslaughter. The jury began deliberation at 2:50 p.m. During deliberation, the jury asked to review several of the video exhibits played at trial. After reviewing the videos, the jury returned its verdict at 7:10 p.m., finding Steele guilty of first-degree murder.

On February 12, 2024, the trial court imposed the sentence of life imprisonment without the possibility of parole. Steele filed a timely post-sentence motion, in which he again sought a mistrial based on the issues raised during the examination of the jurors. The court denied the post-sentence motion in an opinion and order. Steele filed a timely notice of appeal. Both Steele and the trial court have complied with Pa.R.A.P. 1925.

Steele presents the following issue for our review: "Did the [trial c]ourt err in denying . . . Steele's motion to declare mistrial when multiple issues were identified that rendered the jury incapable of rendering a fair and impartial verdict?" Steele's Brief at 4. We review a trial court's decision concerning a mistrial request for an abuse of discretion. *See Commonwealth v. Baker*, 313 A.3d 1112, 1120 (Pa. Super. 2024).

When deciding a motion for mistrial, the trial court's role is to "determine whether misconduct or prejudicial error actually occurred, and if so, to assess the degree of any resulting prejudice." *Id*. (citation omitted). The moving party bears the burden of proving prejudice warranting a mistrial. *See Commonwealth v. Nasir*, 308 A.3d 812, 819 (Pa. Super. 2023).

Our Supreme Court has recognized that a mistrial is an "extreme remedy." *Commonwealth v. Travaglia*, 28 A.3d 868, 879 (Pa. 2011). Therefore, a trial court may grant a motion for mistrial "only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Commonwealth v. Johnson*, 107 A.3d 52, 77 (Pa. 2014) (citation omitted).

"To prevail on a claim that an extraneous influence compromised the impartiality and integrity of the jury," the defendant "must prove the extraneous influence caused a 'reasonable likelihood of prejudice.'" *Commonwealth v. Bomar*, 104 A.3d 1179, 1211 (Pa. 2014) (citation omitted). "There is, however, no *per se* rule in this Commonwealth requiring a mistrial anytime there is improper or inadvertent contact between a juror and a witness" or another person involved in the case. *Commonwealth v. Meredith*, 221 A.3d 186, 191-92 (Pa. Super. 2019) (citation omitted). In assessing the potential prejudice from improper contact with a juror, a trial court should consider: "(1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the

extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature." **Bomar**, 104 A.3d at 1211 (citation omitted).

While "[t]he right to be judged by a fair and impartial jury of one's peers is . . . firm and well-established[,] not every act of juror misconduct warrants the declaration of a mistrial." **Commonwealth v. Flor**, 998 A.2d 606, 639 (Pa. 2010). "When the facts surrounding the possible [juror] misconduct are in dispute, the trial judge should examine the [jurors and other] witnesses on the question, and [its] findings of fact will be sustained unless there is an abuse of discretion." **Commonwealth v. Pope**, 14 A.3d 139, 145 (Pa. Super. 2011) (citation omitted). We defer to the trial court's assessment of whether the misconduct prejudiced the accused because the court "had the opportunity to observe the jurors, the witnesses, and the attorneys and evaluate the scope of the prejudice." **Commonwealth v. Kennedy**, 218 A.3d 420, 424–25 (Pa. Super. 2019) (citation omitted).

Steele argues that four issues uncovered during the trial court's examination of the jurors "raised extreme concern that the jury was not able to render a fair and impartial verdict." Steele's Brief at 12. These issues were: (1) Juror 14's undisclosed personal relationship with Attorney Lazar, calling into question her impartiality; (2) the displeasure among the jurors regarding the slow pace of trial, which raised the potential for a rush to judgment; (3) Juror 14's statement that she saw jurors falling asleep; and (4) concerns that several of the jurors had already decided Steele's guilt, as

evidenced by Juror 13's comment that "he would find the defendant guilty" and Juror 6's testimony that all the jurors knew what they were "down to decision-wise." N.T., 11/16/23, at 552, 570. Steele contends that, when viewed in their totality, these four issues warranted the extreme remedy of a mistrial.

The trial court addressed each of the issues Steele raises in its opinion denying his post-sentence motion. The court found that Juror 14's text message to Attorney Lazar was "highly inappropriate . . . [but] did not rise to the level of requiring a mistrial." Trial Court Opinion, 6/12/24, at 10. The court explained that "the text message did not involve any substance of the case and was not prejudicial to [Steele] in any way." *Id*. Therefore, the court determined that its dismissal of Juror 14, an alternate juror, prior to deliberations remedied the improper communication. *See id*.

The trial court next concluded that Steele's concerns that the jurors would rush to judgment was "speculative." *Id*. at 11. The court explained that it informed the jurors during *voir dire* that trial could take up to five days, and none of the jurors claimed an undue hardship. *See id*. The court observed that the jury's deliberations did not in fact reveal a rush to judgment, as they deliberated from 2:50 p.m. to 7:10 p.m. and asked to review the video evidence. *See id*. With respect to the examination of the jurors, the court found "significant" the comments of several jurors that they understood the gravity of their role and would not rush to judgment. *Id*. The court reiterated that it found credible each of the jurors' statements that they would continue

- 9 -

to follow instructions and remain fair and impartial. *See id*. Therefore, the court determined that "the jurors' complaints [regarding the length of trial] were 'harmless' with no likelihood of impacting the verdict." *Id*.

Concerning Juror 14's comment that other jurors were falling asleep, the trial court explained:

> . . . [T]he record does not establish, other than the testimony of Juror 14, that anyone fell asleep. Juror 14 ultimately only claimed that Juror 13 fell asleep and could not definitely say whether anyone else fell asleep. Throughout individual questioning, no other juror discussed falling asleep or others falling asleep. As Jurors 13 and 14 were ultimately dismissed, [Steele] did not suffer prejudice as to this issue as the [c]ourt remedied the situation at the time of trial.

*Id*. at 12.

With respect to Juror 13's comment that "he would find the defendant guilty," the trial court found, again, that this was "highly inappropriate." *Id*. at 13; *see also* N.T., 11/16/23, at 552. However, the court determined that the comment did not taint the jury as the remaining jurors credibly testified that they would remain open-minded, fair, and impartial. *See* Trial Court Opinion, 6/12/24, at 13-14. The court further observed that, while Juror 6 stated that the jurors were "on the same page" after hearing Steele's confession, she agreed there were still facts to decide. *Id*. at 13; *see also* N.T., 11/16/23, at 573.

Finally, the trial court concluded that the issues identified by Steele, when viewed in their totality, did not warrant the grant of a mistrial. The court stated that "each of the issues were adequately addressed in a manner that

- 10 -

satisfied the [c]ourt that [Steele] did not suffer prejudice to the extent that he was deprived of a fair and impartial trial." Trial Court Opinion, 6/12/24, at 16.

Based on our review, we conclude that the trial court did not abuse its discretion in denying Steele's motion for mistrial. *See Baker*, 313 A.3d at 1120. While the trial court found the two alternate jurors — Jurors 13 and 14 — engaged in inappropriate behavior during trial, neither incident merited the extreme remedy of a mistrial. *See Travaglia*, 28 A.3d at 879. Juror 14's message to Attorney Lazar related to a collateral issue — the presentation of the Commonwealth's case — and not the central issue of Steele's guilt or innocence. *See Bomar*, 104 A.3d at 1211. The court dismissed Juror 13 directly after learning of his "highly inappropriate" comment and before the Commonwealth continued with the presentation of its case. Trial Court Opinion, 6/12/24, at 13. We agree with the court that the alternate jurors' dismissal resolved any potential prejudice to Steele from their continuing in the case.

The court properly conducted a thorough examination of the remaining jurors to assess the effect of Jurors 13's and 14's inappropriate behavior. *See Pope*, 14 A.3d at 145. We defer to the court's assessment that the jurors remained fair and impartial and would not rush to judgment. *See Kennedy*, 218 A.3d at 424–25. Moreover, the record supports the court's determination that Juror 13 was the only juror who fell asleep during trial. Finally, we find no reason to disturb the court's conclusion that the cumulative effect of the

- 11 -

jury issues did not have the unavoidable effect of preventing the jury from rendering a true verdict. *See Johnson*, 107 A.3d at 77.

As we discern no merit in Steele's challenge to the trial court's denial of his motion for mistrial, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/09/2025